### PEOPLE v. BARBERI.

(Supreme Court, Criminal Term, New York County. December, 1896.)

1. CRIMINAL LAW—INSANITY—WHEN A DEFENSE.

A person is not excused from liability for the commission of an alleged criminal act on the ground of insanity, except on proof that, at the time of committing it, he was laboring under such a defect of reason as either not to know the nature and quality of the act, or not to know that the act was wrong.

2. SAME—EVIDENCE—BURDEN OF PROOF.
   Where insanity is set up as a defense, and defendant offers evidence that he was insane at the time of committing the act, the prosecution must prove his sanity by a preponderance of evidence.

3. SAME—EPILEPSY—AUTOMATISM.
   A defect of reason sufficient to excuse from criminal liability may be made to appear by evidence that the accused, at the time of the commission of the act alleged, was suffering from an attack of epilepsy, and thereby rendered unconscious, and capable of acting only automatically, without any design or purpose, and without any memory of such act.

4. SAME—EVIDENCE—TESTIMONY OF EXPERTS.
   The opinions of men of study, experience, and skill in the particular branch of learning relating to the matter under judicial investigation are entitled to great weight where they are invariable conclusions founded on facts that have been satisfactorily established, and to but little weight where they are merely speculative.

5. SAME—JURY—REASONABLE DOUBT.
   A reasonable doubt is one which arises from the evidence and its character, or from the absence of satisfactory evidence in the case, and is such a doubt as a reasonable man might entertain after a fair review and consideration of such evidence; and therefore, where the jury, on such consideration of all the evidence, with such presumptions and inferences as fair-minded and intelligent men have a right to draw from the facts established, have such a conviction of the guilt of the accused that a prudent man would feel safe in acting on such conviction in matters of the highest concern and importance to himself, they may safely say that such guilt is established beyond a reasonable doubt.

John F. McIntyre and Alfred Lauterbach, for the People.

Friend, House & Grossman (F. B. House and Edward Hymes, of counsel), for defendant.

Marie Barberi being on trial for the crime of murder, the jury were instructed as follows:

GILDERSLEEVE, J., charging the jury, said in part: The contention here, gentlemen, is over the mental condition of the defendant at the time of the homicide. In brief, the sanity of Marie Barberi may fairly be said to be the sole question litigated upon this trial. The defense offered to the charge presented by the indictment is irresponsibility. The learned counsel for the defendant, in his opening address, made the following declaration: "She [meaning the defendant] did not know what she was doing when she wielded that razor. It was done in an automatic and an unconscious way. So far as the powers of her mind were concerned, reason was gone." He went on to say that, at the time of the commission of the alleged criminal act, the defendant was suffering from the disease known as "epilepsy." It has been the effort of the defense to show that, at the time the defendant killed Cataldo, she was suffering from a psychical epileptic attack, which deprived her, for the time, of reason, and that what she did in the saloon was done in an automatic and unconscious way, without an understanding on the part of the defendant of the nature and quality of the act. It is not claimed that the defendant is a maniac, and should be put in custody as permanently and dangerously insane, and have her civil existence terminated. The effort of the defense has been to

bring the defendant within the exemption from liability extended to the unfortunate by the laws of our state.

Our statute provides that an act done by a person who is an idiot, imbecile, lunatic, or insane is not a crime. They may be held liable for damages in a civil action, and they are sometimes, but under the law they are held incapable of committing a criminal act. The statute then proceeds to state what the test shall be, and provides as follows:

"A person is not excused from liability as an idiot, imbecile, lunatic, or insane person, except upon proof that at the time of committing the alleged criminal act he was laboring under such a defect of reason as either (1) not to know the nature and quality of the act he was doing, or (2) not to know that the act was wrong."

The law presumes every one to be sane and responsible for his acts until the contrary be shown by the evidence. When insanity is set up as a defense to an alleged criminal act, and the defendant offers evidence tending to prove he was insane at the time of the homicide, the legal presumption of sanity is rebutted, and the prosecution must prove sanity by a preponderance of evidence. It is also the rule that, if defendant's evidence creates a reasonable doubt as to her sanity at the time of the killing, the prosecution must remove that doubt by a preponderance of evidence. By "preponderance" I do not mean a preponderance in point of numbers of witnesses, but a preponderance of facts and circumstances that are convincing to your minds.

The history of the Barberi family has been put in evidence, for the purpose of showing the existence of epilepsy in defendant's ancestors, and hence the predisposition of defendant to that disease. It has been sought to show the physical and mental condition of the defendant from infancy, and proof has been offered of incidents in her life indicating the presence of epilepsy. The testimony of eminent experts, of great experience and learning in mental alienation, has been given to explain to you what they respectively understand, from their observation and knowledge acquired from books, to be the characteristics of the disease known as "epilepsy." All its phases and degrees, as they are believed to exist by the learned gentlemen to whom you have listened, have been explained, including the appearances, acts, and conditions that are regarded as manifestations of epileptic attacks. All this has been done that you may be able to judge of the condition of the defendant's mind at the time of the commission of the homicide. Moreover, in conclusion, to many of the learned gentlemen was put a hypothetical question, assuming a large number of facts, and an opinion as to the condition of the mind of the defendant at the time in question was elicited. They were not unanimous in their opinions, as you will readily remember,—in all respects, certainly. In some respects they agreed. In short, the doctors do not agree. It has sometimes been said, "Who shall decide when doctors disagree?" It is my duty to say to you that in this case, though the doctors have disagreed, you must decide. You must decide this, namely: Has the defendant, by the testimony in the case, met the requirements of the statute, and satis-

factorily shown that, at the time of the commission of the alleged criminal act, she was laboring under such a defect of reason as either not to know the nature and quality of the act she was doing, or not to know that the act was wrong?

You have observed that the effort of the defense has been to make it appear that at the time of the commission of the act in question the defendant was unconscious, claiming therefrom, and very properly, that, if unconscious, she was laboring under the defect of reason required by the statute to excuse her from criminal liability; and much inquiry has been therefore directed to eliciting all facts which tend to show in the defendant a presence of memory as to what occurred in the saloon, or facts that tend to show that there is an entire absence of memory as to what took place as to the acts that constituted the homicide. Memory figures very prominently and importantly in the consideration of the question as to whether the defendant was or was not conscious at the time of the killing of Cataldo. It is claimed that a victim of epilepsy, when suffering from an attack, is in an unconscious condition; that whatever is done is done automatically, without any design or purpose. On this branch of the case, I think I should for a moment read a few statements from Dr. Hamilton, since Dr. Hamilton seems to be the one expert who is practically not attacked by either side, and his ability and experience seemed to be fully recognized by the counsel for the defense, as well as the counsel for the people. I do not wish to be understood as asserting that the defense admits that all of the conclusions stated by Dr. Hamilton are correct by any means, but I make this explanation of why I read a little as to what Dr. Hamilton says as bearing upon the question of consciousness or unconsciousness at the time of the commission of the act by the defendant. The doctor says that those who suffer from epilepsy are likely to grow progressively worse, and then this question was put:

"Q. What characterizes the crimes of epileptics? A. Their violence, their purposelessness, their want of premeditation and want of motive, and the fact that the patient has no memory of them afterwards."

There are several characteristics, as Dr. Hamilton says, that are observed in the crimes of epileptics; and, further on, in reply to the question, "Is not the loss of memory an important factor in bringing you to a conclusion as to the unconscious condition of the epileptic?" the doctor said, "It would govern me, yes." He would be governed by the fact as to whether the alleged epileptic did or did not remember the acts committed while in the state of epileptic automatism. Then these questions were put:

"Q. And does loss of memory follow conditions of epilepsy? A. It does. There is sometimes a loss of memory of the warning, or aura, as it has been called, but I am broad enough to believe that the epileptic fit implies an absolute loss of consciousness. Q. Would an epileptic, doctor, be likely to remember the details of a crime, and the motives which led to its commission, and repeat them several times after the time of its commission, and totally forget them a year later? A. He would not. A patient in epileptic automatism, practically, is a different person from himself. When he becomes epileptically automatic, he loses his identity, and he becomes another person. As a rule, it is a quiet condition. Q. Would an epileptic be likely to carry in this new

state of automatism any purpose decided upon before? A. As I have said, no.
I don't know of any case."

I have said the doctors do not agree, and you have heard it stated
by the experts that it is their belief that an epileptic is unable to
remember any of the acts committed while in a state of epileptic
automatism; that, while they are of that opinion, they concede that
other eminent alienists and eminent physicians entertain the other
view, and believe it possible. It was said by some of the experts that
an epileptic was sometimes in a condition of subconsciousness when
not suffering from convulsions, which usually resulted in a fall to
the ground of the patient, and an incapacity to perform physical
acts; that, while in the subconscious state, they commit acts that
have the appearance of being under the control of the will, and being
suggested or prompted by the operation of the mind, but that it is
an abnormal and unnatural consciousness, and that those acts are
abnormal and unnatural, and, while they appear to be operations of
the will, they are really automatic and mechanical. You have lis-
tened to much learning upon this branch of the case. It is unneces-
sary for me to stop and direct your attention more particularly,
I take it, to what the witnesses have said. The rules that must gov-
ern you in reaching a conclusion, and in estimating and weighing
this expert testimony, I shall lay down for your guidance. You
must not forget, however, in disposing of this branch of the case,
that it is not to be decided upon any particular part of the testi-
mony, but after a consideration of all the evidence in that case.

I have read to you, gentlemen, the law which clearly states the
dividing line between responsibility and irresponsibility. There is
no trouble about that. The members of the legislature have made
that very clear. The witnesses have placed before you the facts,
but no witness, not even an expert, has been allowed to state
specifically upon which side of that line the defendant shall be
placed. That question is for you. Gentlemen, do not confound
these two propositions, namely, the alleged irresponsibility of the
defendant at the time of the commission of the homicide, and the
assertion that the Barberi family is a family of epileptics. It does
not follow that, because a person is an epileptic, he is incapable of a
violation of law, and must be excused from criminal liability. It
is only at times that epileptics are unconscious or irresponsible;
that is, when the disease breaks out into what is known as "epilep-
tic furor," which may come without special warning, and after a
brief period pass away. You must also bear this in mind: that it
does not necessarily follow that because the mind is diseased, be-
cause it is not entirely sound, it may not have sufficient reasoning
power to distinguish right from wrong in respect to a particular act.
It is not every form or degree of insanity that carries along with it
immunity from punishment for wrongs committed. This is the ques-
tion for you: Has such a defect of reason been proven as to absolve
the defendant from amenability to the law?

It is not claimed that your verdict should be "Not guilty," for the
reason that Cataldo was a bad man, who had cruelly wronged the
defendant, although your attention has been addressed to his char-

acter, and not improperly, and that there was great provocation for the defendant's act; nor that the situation in which she had been placed, and the disgrace attending it, were constantly the subject of her thoughts, and prayed upon her mind, until her state of agitation was such that, when she confronted the deceased in the saloon, the insulting refusal threw her into a passion, and rendered her incapable of forming a design, and that, under such conditions and circumstances, she struck the fatal blow. These are not the grounds urged by the defense to secure liberty for the defendant. If those facts are established, must it not be said that the crime of manslaughter is proven? Do not confound the heat of passion that may have temporarily disturbed her reason with the real defense presented, to wit, a condition of automatism, brought about by an epileptic attack, to which she was predisposed, that rendered her unconscious, incapable of making a choice, and, while in this state, it happened that she killed Cataldo, without method or intention; and we are told that any other person present was just as likely to have received the blow as Cataldo, provided she was in the condition of epileptic automatism that rendered her unconscious, incapable of making a choice, of forming a design, and of committing an act that she understood. I now repeat, from all the testimony, does it satisfactorily appear that, at the time the defendant cut the throat of Cataldo with the razor, she was laboring under such a defect of reason as not to know that the act was wrong, or not to know its nature and quality? It is for you to say. It is the crucial point in the case, and your verdict depends upon its decision. And, right here, while I shall not stop to explain to you now fully what is meant by "reasonable doubt," but do so later, I say to you that the rule requiring the evidence to satisfy the jury beyond a reasonable doubt is one in favor of the individual on trial charged with crime, and is applicable to the general conclusion of guilty or not, from a full consideration of the whole evidence. I have said that all the testimony must be considered. It seems proper to now direct your attention more fully to the expert testimony, or rather to the rules that are to be applied in estimating the weight it shall receive.

In the departments of learning and science that include, among others, medicine, neurology, criminology, psychology, and alienism, there are many facts, and many deductions inferable from facts, which are out of the sphere of the knowledge of men in general. They are not supposed to be understood by the court or by the jury. Men of study, experience, and skill in the particular branch of learning to which the judicial investigation may relate are permitted to aid, by giving the light that such study, experience, and skill will throw upon the subject. Their opinions are stated as deductions which are proved in such study and experience to flow from the facts stated. The value, however, of the opinions of experts, differs largely in degree in different cases. It is of the first importance that the facts upon which they are founded be satisfactorily established. Where the expert states precise facts in science as ascertained and settled, or states the invariable conclusion which results from the facts stated, his opinion is entitled to great weight. When he gives

only the probable inference from facts stated, his opinion is of less importance, because it states only a probability. Where the opinion is speculative, theoretical, and states only the belief of the witness, while yet some other opinion is consistent with the facts stated, it is entitled to but little weight in the minds of the jury. Opinions of experts are presented as an aid to the jury. It is strictly within the province of the jury to disregard each and every opinion uttered by experts. Do not confound your duty as to the law with your duty as to the medico-legal branch of the case as presented by the experts. While you are bound to take the law from the court, there rests upon you no obligation to adopt the medico-legal views of the experts.

The highest court of this state, our court of appeals, in speaking of the testimony of experts, has used the following language:

"We have said lately that the rules admitting the opinions of experts should not be unnecessarily extended, because experience has shown it is much safer to confine the testimony of witnesses to facts in all cases where that is practicable, and leave the jury to exercise their judgment and experience on the facts proved."

And, again, the court has said:

"It is generally safer to take the judgment of unskilled jurors than the opinions of hired and generally biased experts."

In a Massachusetts case, which is worthy of consideration, it was said:

"Juries are to judge of facts, and, although the opinions of professional gentlemen on facts submitted to them have justly great weight attached to them, yet they are not to be received as evidence, unless predicated upon the facts testified either by them or by others."

I think you may safely look for the main assistance to be derived from expert testimony in the details to which we have listened regarding the characteristics of the disease of epilepsy, and of the conditions and outward manifestations that are essential to its existence. The testimony of these learned gentlemen upon the characteristics of the disease will aid you very materially in determining whether the defendant was or was not suffering from it at the time of the commission of the homicide. You are the judges of all questions of fact. The opinions of experts are to be considered in aid of your judgment, and no expert opinion should be given any weight that is predicated upon facts not established by the evidence. You should consider all the facts and circumstances disclosed by the evidence on both sides, inclusive of the probabilities fairly deducible from such facts as you may find fairly to be established. The question to be determined is one of opinion, based upon such facts as you conclude are established. Your conclusions should be the result of your own honest opinion, after due consideration of all the opinions given by the witnesses, and of the whole evidence in the case, and after due consideration of the rules of law I have laid down for your guidance.

The rule of law which throws around the defendant the presumption of innocence, and requires the state to establish beyond a reasonable doubt every material fact averred in the indictment, is not intended to shield those who are actually guilty from just and mer-

ited punishment, but is the humane provision of the law which is intended for the protection of the innocent, and to guard, as far as human agencies can, against the conviction of those unjustly accused of crime. Such a doubt—and I am now defining what in law is meant by a reasonable doubt—is not a mere guess or surmise that the accused may not be guilty. It is such a doubt that a reasonable man might entertain after a fair review and consideration of the evidence. It is one which arises from the evidence and its character, or from the absence of satisfactory evidence in the case. If, upon a consideration of all the evidence in the case, with such presumptions and inferences as fair-minded and intelligent men have a right to draw from the facts which have been established, the jury have such a conviction of the defendant's guilt that a prudent man would feel safe to act upon that conviction in matters of the highest concern and importance to himself, they may safely say that the case is established beyond a reasonable doubt. If, after a careful comparison and candid consideration of all the evidence in the case, you have a doubt of the defendant's guilt, it will then be your duty to determine whether such doubt is reasonable and sufficient in law to acquit the defendant; and if, after applying the law defining such doubts, as laid down in these instructions, you find that the doubt in question is not a reasonable one, then it will not be sufficient in law to acquit the defendant. A doubt, to justify an acquittal, must be a reasonable one, and it must arise from a careful, candid investigation of all the evidence in the case; and unless the doubt is a reasonable one, and does so arise, it will not be sufficient in law to authorize a verdict of not guilty. Your verdict should be the natural impression which, under the rules given you for your guidance, the evidence has made upon your minds. You should not undertake to resort to artificial and vague methods. No supernatural aid must be expected to come to your assistance in the discharge of your important duties. Good common sense, illumined by a watchful conscience, should enable you to reach a righteous and fair verdict. It is your duty, gentlemen, to agree if possible, and I ask you not to shirk your duty. No juror should form a fixed opinion without having heard and considered the opinions of his fellow jurors. All should calmly and dispassionately discuss and review the testimony, consult with one another, and try to harmonize the differences, if any exist. I caution you to remember your promise not to be influenced by sympathy, compassion, or the consequences of your verdict.

The character of the deceased, as disclosed by the evidence, and the wrongs of which he may have been guilty, are only to be considered for the purpose of determining what took place prior to the commission of the alleged criminal act, and for the purpose of determining what may reasonably be presumed to have influenced the mind of the accused at the time of the homicide. His alleged seduction of the defendant, and his brutal conduct, have not been, nor could they be, urged as grounds for an acquittal. It may be that Cataldo was a man unfit to live, but the judge who is to determine that does not sit in that jury box nor upon this bench. An eminent judge in this city once said:

"The general bad character of a person slain can neither tend to show that the party is not guilty of homicide, or in any sense mitigate the taking of human life. Equality before the law is a maxim of universal justice, and the life of the humblest and most abandoned is equally entitled to the protection of the law as that of the most cultivated, refined, or elevated. It is not for man to say which may be taken, and which spared. In the eye of the law, to murder the vilest and the most abject of the human race is as great a crime as to murder its greatest benefactor."